# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-02024-SCT

*CHARLES N. JAMES*

*v.*

*RACHEL M. CARAWAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/16/2006 |
| TRIAL JUDGE: | HON. KOSTA N. VLAHOS |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MELINDA O. JOHNSON |
| ATTORNEY FOR APPELLEE: | MARIANO J. BARVIE' |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 09/04/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     On September 20, 2001, Rachel M. Carawan filed a negligence suit against Charles N. James in the Circuit Court of Hancock County stemming from an automobile accident in which she suffered injuries to her back. On July 31, 2003, prior to trial, James captured video of Carawan riding various rides at the Six Flags amusement park in New Orleans, Louisiana. The day before trial, Carawan stipulated that she would not seek damages beyond July 29, 2003, and moved to exclude the Six Flags video. Carawan asserted that she had fully recovered as of July 29, after undergoing an epidural steroid injection that same day. The court excluded the video. The jury returned a verdict for Carawan in the exact amount

of her medical bills and lost wages. The trial court subsequently granted an additur. Because we find the trial court erred in excluding the July 2003 Six Flags video as evidence, we reverse and remand for a new trial.

**FACTS AND PROCEDURAL HISTORY**

¶2.   On December 19, 2000, Carawan, Pamela Liles, and Liles's three-year-old daughter stopped for gas at a Chevron station in Diamondhead, Mississippi. Carawan, who was driving a 1996 Honda Civic, got out and pumped the gas, while Liles's and Liles's daughter remained inside the vehicle. As Carawan waited for the tank to fill, she leaned against the vehicle with her backside. About this same time, Carawan heard Liles scream and turned her head just before her rear bumper was struck by a 1996 Ford Crown Victoria. James, the driver of this vehicle, failed to see Carawan's car as he backed out of his parking space. The force of the impact threw Carawan forward and caused a small dent in her bumper, along with some chipped paint.[1] Carawan experienced no immediate pain or injury from the accident.

¶3.   When Carawan awoke the next morning, she experienced stiffness and soreness in her back. She reported to work at the Grand Casino in Gulfport, but was soon dismissed because she was unable to perform her work. That same day, she went to Hancock Medical Center

---

[1] The parties dispute the severity of the impact. Liles, who was sitting in the front passenger's seat at the time, stated that the impact caused her to be "thrown back" toward the driver's seat. The accident caused $386 in damages to Carawan's vehicle. James estimated that he was going about two miles per hour when he hit Carawan's car. Furthermore, he did not notice any tire marks on the pavement to indicate her vehicle had actually moved as a result of the impact.

2

in Bay St. Louis and received some pain medicine and muscle relaxers. A week later, as the pain and tightness continued, she went to Memorial Hospital in Gulfport. Carawan was examined, given some muscle relaxers, and told to return for a follow-up examination if the pain did not subside within a week.

¶4. In January 2001, Carawan sought treatment from Dr. Michael Wilensky, who prescribed Celebrex and recommended physical therapy. Wilensky also provided her a doctor's note excusing her from work for December 2000 through March 2001. Carawan attended physical therapy sessions from April 2001 through July 2001, but did not attend every session because she had to care for her bedridden father. While undergoing physical therapy, she experienced intermittent periods of relief, followed by relapses of pain.[2]

¶5. Around the end of April 2001, Carawan returned to work as a bartender. Accommodations were made so that she would not have to perform any excessive lifting. Despite these accommodations, Carawan experienced increasing tightness in her back due to the repetitious lifting required in bartending.

¶6. In June 2001, Carawan began seeing orthopedic surgeon Dr. M. F. Longnecker, Jr. Longnecker performed a magnetic resonance imaging examination (MRI), the results of which appeared normal. He diagnosed her problems as being muscular in nature, and prescribed a gradual exercise program, incorporating aquatherapy, along with continued use

---

[2] Carawan testified about two specific instances which re-aggravated her back—once when she attempted to maneuver her father in his bed, and once when she slid a chair up to a table.

3

of anti-inflammatory medicine and muscle relaxers. Longnecker ended his treatment of Carawan in July 2001.

¶7.    On September 20, 2001, Carawan filed suit against James in the Circuit Court of Hancock County. Carawan claimed that she had suffered severe injuries as a result of James's negligence. According to the complaint, these alleged injuries extended to her head, neck, and back, and caused excruciating pain that ultimately rendered her temporarily and totally disabled. James denied the allegations in his initial answer.

¶8.    Thereafter, in February 2002, citing persistent pain in her mid-to-lower back, Carawan sought the services of Dr. Victor T. Bazzone.[3] Following an initial examination, Bazzone's differential diagnosis was either (1) a ruptured disk or (2) myofascial disease, which Bazzone defined as an irritation or malfunction to muscles and the covering of the muscles. Bazzone performed a second MRI of Carawan's lower back, which revealed a small bulging of disks.[4] For a better picture of the bone itself and the disks, Bazzone conducted a myelogram and a computerized tomography (CT) scan.[5] While not ruling out the possibility of a ruptured disk, he diagnosed primarily a myofascial injury. For treatment, he prescribed 400 milligrams of

---

[3] Bazzone frequented the Lb's Restaurant at the Grand Casino where Carawan worked. After observing Carawan's difficulty working and walking, he suggested that she come by his office for an evaluation.

[4] Bazzone recommended another MRI because the previous one had focused on the chest and neck areas, rather than her lower back.

[5] According to Bazzone, a myelogram is a diagnostic test involving a spinal tap which inserts dye into the area surrounding the spinal cord. Once the dye is in place, a CT scan is conducted.

ibuprofen daily, weight/resistance training three days a week, and walking one-to-one-and-a-half miles, six days a week. Any future appointments were left to Carawan's discretion.

¶9. Carawan returned to Bazzone in March 2003 because of continuing back pain and, as a new development, numbness in her big toe. Because of this change and the passage of time since her last examination, Bazzone performed another MRI, which showed that the disk had moved a little more.[6] At this point, the possibility of surgery was discussed. Carawan, however, elected not to undergo surgery because she wanted to finish her degree.[7] Thus, Bazzone simply prescribed a new anti-inflammatory drug.

¶10. In May 2003, Carawan went back to Bazzone with increasing pain and further decline. Surgery was discussed again, but Carawan chose not to undergo it because of her father's deteriorating condition. Believing that surgery probably would be necessary at some point, Bazzone sent her to Dr. Michael Lowry, a neurosurgeon in Gulfport, for a second opinion. Lowry later sent Bazzone a letter which stated:

> After review of the MRI scan, myelogram and examination of the patient, I find that these studies appear normal to me. You have certainly treated her much longer and may have a better clinical feel for her condition. At this time, I do not see anything that I could offer in the way of surgery that would help this young lady.

¶11. With surgery at least on hold, Bazzone excused Carawan from work, prescribed her pain medication in form of Percocet, and referred her to Dr. Bryan Dix, an anesthesiologist

---

[6] Bazzone explained that this MRI was clearer than the previous one.

[7] Carawan was earning a degree in sign language.

in Gulfport, for epidural steroid injections. Carawan received her first steroid injection on July 15, 2003. She experienced significant improvement, testifying that, "it was great . . . . I felt full of life. I just wanted to go like run . . . . I was really, really, happy . . . ." Dix noted an approximate twenty percent alleviation of her symptoms. A second injection was given on July 29, 2003.

¶12. Effective July 25, 2003, Carawan was authorized to return to work, initially on a limited basis of two days per week, six hours a day, for three weeks.[8] In an office note dated August 12, 2003, Bazzone wrote that:

> The patient's symptomatology has not really changed since I last saw her.[9] I am going to allow her to work three days per week, eight hours per day. This restriction will last for approximately 3 months at which time, I shall re-evaluate her to see if this needs to be changed that is either she can work more or the restrictions must be more restraining.

*The Six Flags Video*

---

[8] At a pre-trial motion hearing, counsel for Carawan explained that Carawan herself had contacted Bazzone and asked that the restrictions be lifted so that she could return to work full-time. The record includes a one-sentence letter dated July 25, 2003, in which Bazzone released Carawan to work without any limitations. Apparently, this letter was never sent or used. Carawan's brief acknowledges that she worked under Bazzone's limitations. Additionally, there is a handwritten notation on the July 25 letter which states that "Pt. didn't need letter - Job will Allow 2 days - restriction." A jury reasonably could find that Carawan requested that the restrictions be removed out of concern that her employer would not accommodate her.

[9] It is unclear as to when Carawan last visited Bazzone prior to the August 12, 2003, note. In a letter dated July 22, 2003, Bazzone stated that Carawan had recuperated sufficiently to return to work part-time. However, it is unclear whether Bazzone actually evaluated Carawan on that date. Her next most recent visit appears to be May 2, 2003, when Bazzone observed that Carawan had "deteriorated quite precipitously."

¶13.    On July 22, 30, and 31, 2003, James obtained surveillance video of Carawan.  The July 31 footage showed Carawan riding various rides at the Six Flags park in New Orleans, Louisiana, including several roller coasters.

¶14.    With this new evidence, on September 11, 2003, James filed a motion to compel a supplemental deposition of Carawan regarding her physical limitations prior to July 31.  At a hearing on September 15, 2003, the trial court denied James's Motion to Compel and ordered immediate disclosure of the July 2003 video.[10]

*Pre-trial Proceedings*

¶15.    In preparation for trial, Carawan designated Longnecker and Bazzone as expert witnesses.  While James did not designate any expert witnesses, he filed notices of intent to offer medical records; employment records; auto-repair records; accident reports of the December 19, 2000, incident and a later wreck involving Carawan on November 3, 2003;[11] and two sets of video surveillance records and tapes—one from August 3-17, 2001, and one from July 22-31, 2003.  Carawan objected to James's Notice of Intent to Offer Surveillance Records and his Notice of Intent to Offer Employment Records.  Carawan's objection to the surveillance records, however, pertained only to the August 3-17, 2001, footage.[12]

---

[10]  Although James's Motion to Compel is part of the record, the record contains no order regarding the motion, nor any transcript of the September 15, 2003, hearing.

[11]  Carawan was involved in another automobile accident on November 3, 2003.  This later accident, however, is not at issue before us.

[12]  James's notice of intent to offer the August 3-17, 2001, video surveillance was first filed on March 13, 2003, and once again on March 29, 2004.  Carawan's objection was filed on March 20, 2003.  The Six Flags surveillance was not taped until July 22-31, 2003, and

7

¶16. On April 5, 2004, Carawan filed a motion in limine, seeking, among other things, to preclude the admission of surveillance videos or photographs "that have not been produced through discovery."[13] At that point, both the August 3-17, 2001, and July 22-31, 2003, videos had been produced. Carawan also stated that "she is not claiming any injury as a result of this wreck beyond November 3, 2003."[14]

¶17. On April 5, 2005, Judge Stephen B. Simpson held a hearing regarding pending motions. At that time, Carawan indicated that she would not "introduce any evidence of future lost wages or future pain and suffering or future medical bills past . . . July 29, 2003, which is when Ms. Carawan went and had the second epidural injection." With no damages being sought beyond July 29, 2003, Carawan made an ore tenus motion to exclude the July 2003 video containing the Six Flags footage. Judge Simpson took the motion under advisement. On the first day of trial the following day, Judge Simpson sustained Carawan's motion on the basis that "no damages in the form of medical expenses, future lost wages, or future medical expenses are being sought from and after July 29, 2003. I am of the opinion

James did not file any notice of intent concerning that video until March 31, 2004.

[13] Carawan further requested "[t]hat should [James] wish to introduce any motion picture film into evidence, the same be tendered to Court outside the presence of the jury, and shown or exhibited to determine its relevance and suitability for introduction into evidence . . . ."

[14] James also filed a motion in limine on April 2, 2004, requesting, among other things, that "no testimony be given regarding future medical expenses and lost wages." James's motion, however, provides no reference point from which medical expenses and lost wages should be calculated.

that the prejudicial value of [the video] outweighs its probative value given [Carawan] is seeking no relief from and after that date."

*Trial Proceedings*

¶18.    Trial commenced on April 6, 2005.  In cross-examining Carawan's first witness, James attempted to elicit information regarding Carawan's visit to Six Flags.  The trial court declared a mistrial.

¶19.    A second trial was held on August 14-16, 2006, with Judge Kosta N. Vlahos presiding.  The trial court maintained Judge Simpson's prior ruling to exclude the July 2003 Six Flags video.  The trial court also excluded Carawan's medical records on the basis that James had failed to properly admit such records.[15]  Carawan's employment records also were excluded on the ground that James had not scheduled a pre-trial hearing following Carawan's objection to his intent to offer such records.[16]  Additionally, the trial court refused James's proposed jury instruction regarding Carawan's failure to mitigate her damages.[17]

---

[15]  The trial court found that James had tried to offer medical records in a piecemeal fashion, rather than in their entirety.  *See* Miss. R. Evid. 106; Miss. Code Ann. § 41-9-109 (Rev. 2005).  Judge Vlahos stated:

> [T]he statute calls for a certain certificate to be attached to the hospital records.  If you have that you dump the whole record in there . . . .  If you don't have that I can't go anywhere with that. . . . All I ask is that you show me what the statute requires that's in the file or in your records and then I'll consider it.  Otherwise, just move on to something else, but we can't have taking the packet of the custodial record apart.  It has to be like it came from the hospital.

[16]  *See* Miss. R. Evid. 902(11)(C)(iii).

[17]  The trial court found that James had not presented any evidence showing that Carawan had failed to mitigate her damages.

9

¶20.    The jury returned a nine-three verdict in favor of Carawan, awarding her the exact amount of her medical bills and lost wages in the sum of $33,484.52.  A final judgment was entered on August 16, 2006.  James filed a motion for a new trial, and Carawan filed a motion seeking an additur for her pain and suffering.  On October 23, 2006, after hearing both motions, the trial court entered an order denying James's motion for a new trial, and granting Carawan's additur in the amount of $30,000.[18] The new amount totaled $63,484.52.

¶21.    James filed a notice of appeal on November 20, 2006, raising the following issues for review: (1) whether the trial court abused its discretion in excluding the video of Carawan at Six Flags on July 31, 2003; (2) whether the trial court abused its discretion in not admitting Carawan's medical and employment records; (3) whether the trial court improperly denied James's proposed jury instruction regarding mitigation of damages; and (4) whether the trial court improperly granted an additur and improperly denied James's request for a new trial. Finding the first issue dispositive, we do not address the remaining issues.

## DISCUSSION

**Whether the trial court abused its discretion in excluding the video of Carawan at Six Flags on July 31, 2003.[19]**

---

[18]  The trial court found that "the medical bills incurred by the Plaintiff in this case were uncontradicted and no allowance was made for pain and suffering on the part of the jury.  As such, the Court finds that the jury verdict was contrary to the overwhelming weight of the credible evidence and so inadequate as to shock the conscience of the court."

[19]  Carawan submits that this Court cannot consider the July 31, 2003, video because it was not made a part of the record on appeal.  At the time Carawan filed her brief, the Six Flags video was, in fact, not part of record.  However, on February 4, 2008, this Court granted James's Motion to Supplement Record.

10

¶22.    This Court applies an abuse-of-discretion standard when reviewing a trial court's admission or exclusion of evidence. ***Payne v. Whitten***, 948 So. 2d 427, 429 (Miss. 2007) (citing ***Floyd v. City of Crystal Springs***, 749 So. 2d 110, 113 (Miss. 1999)). Where an error involves an evidentiary matter, this Court "will not reverse unless the error adversely affects a substantial right of a party." ***Whitten v. Cox***, 799 So. 2d 1, 13 (Miss. 2000) (citing ***Floyd***, 749 So. 2d at 113).

¶23.    James argues that the trial court abused its discretion by not allowing the Six Flags video into evidence.[20] The trial judge excluded the video on the basis that, since no damages were being sought after July 29, 2003, its prejudicial value outweighed its probative value. James argues that this ruling adversely affected his right to present relevant evidence challenging the extent of Carawan's injuries. He submits that he was unable "to question [Carawan's] credibility, and to make true inquiry as to what she was and was not able to do physically at that given time." Furthermore, he contends that Carawan's decision to limit her damages occurred only after the production of the Six Flags video and was specifically "crafted" to exclude its admission.

¶24.    Carawan, on the other hand, maintains that the Six Flags video is both irrelevant and highly prejudicial because it features events that occurred subsequent to the time for which

---

[20] James asserts two other arguments with respect to the Six Flags video. Because we find the exclusion of the video dispositive, we do not address these arguments.

11

she sought damages.[21] According to Carawan, James's argument requires him to assert that she was injured longer than she alleged, that she lost more wages than she claimed, and that she incurred more medical expenses than she requested.

¶25. Our first concern is whether the Six Flags video was relevant pursuant to Rule 401 of the Mississippi Rules of Evidence. "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. Admission is favored if the evidence has any probative value at all. Miss. R. Evid. 401, cmt.

¶26. As previously noted, the July 2003 video contained images of Carawan riding several rides at Six Flags on July 31, 2003. This footage had a tendency to make the existence of a fact—the severity of Carawan's injuries and her truthfulness in communicating these injuries to her doctor—more probable or less probable than it would be without such evidence. Miss. R. Evid. 401. The severity of her injuries, in turn, relates to the necessity of at least some of her medical expenses, the basis of her claim for lost wages, and the extent of her pain and suffering.

¶27. A reasonable juror could conclude that the Six Flags video casts doubt on the severity of Carawan's injuries prior to July 29, 2003. According to the facts presented at trial, Carawan had been unable to work since May 2003, but experienced significant improvement

---

[21] Notably, Carawan did not dispute the authenticity of the video when it was proffered and identified as an exhibit.

following the first steroid injection on July 15, 2003. Approximately one week later, Bazzone sent Carawan back to work on a part-time basis of two days a week, for three weeks, so that she could "gradually build up her strength and endurance," and to ensure that her relief was permanent. A second steroid injection was administered on July 29, 2003, which became Carawan's cut-off date for seeking damages. In sum, the picture conveyed is that Carawan had been debilitated for months prior to receiving the steroid injections and was gradually able to return to work full-time.

¶28. Yet, just six days after the effective date of her limited return to work, Carawan was seen riding various rides, including several roller coasters. A reasonable juror might find subjecting oneself to the twists and forces associated with such rides difficult to reconcile with a recent history of physical problems that consisted "primarily of pain in the back which was increased by walking, by bending, by twisting, and often times just by sitting in one position for any long period of time." Even assuming that Carawan had made a full recovery following her second steroid injection, a reasonable juror could view this conduct as inconsistent with (1) Carawan's claims of severe back pain on and off for the past three years, (2) her work history, (3) her claim that she considered back surgery, and (4) her claim of a gradual recovery.

¶29. Furthermore, a reasonable juror might conclude that the Six Flags video has a tendency to show that Carawan may not have been as weakened or vulnerable as she indicated to her doctors or as her medical treatments suggest. This video, capturing acts so close in time to the period for which she sought damages, could have been used to call into

13

question at least some of her medical expenses. The video also could have been relevant to whether or not she truly had been unable to work. Furthermore, even though the jury did not award Carawan any damages for pain and suffering, the trial court awarded such damages in granting the additur. Had the video been admitted into evidence, it would have been relevant in this determination as well. Perhaps most significantly, from the jury's perspective, this video might shed doubt upon the merits of Carawan's case as a whole.

¶30.   In *Sweet v. Pace Membership Warehouse, Inc.*, 795 A.2d 524 (R.I. 2002), the Supreme Court of Rhode Island faced a similar set of facts. A plaintiff sought damages after being injured on the job. *Id.* at 526. After the defense proffered video evidence of the plaintiff performing various activities, the plaintiff limited his damages to a time predating the video. *Id*. at 527. The trial court excluded the video because it concerned a period of time for which the plaintiff was not claiming damages. *Id*. In reversing the trial court, the Supreme Court of Rhode Island held that the video's relevance was not lessened by the fact that the plaintiff had limited his damages to before a particular date. *Id*. at 528-29. The Supreme Court of Rhode Island stated that, "[e]vidence tending to show that [the plaintiff] had fully recovered from his injuries at some point after November 25, 1997, undisputedly would render it 'less probable'—within the meaning of Rule 401—that [the plaintiff] suffered from 'severe and permanent injury' during the period for which he claimed damages." *Id*. at 528. While not binding precedent for this Court, *Sweet* bears some factual similarity to the case before us.

14

¶31.    Unlike the plaintiff in *Sweet*, who indicated during pretrial and trial proceedings that his injuries were permanent, Carawan maintained throughout trial that she had fully recovered after the second steroid injection.  In her brief, Carawan asserts that she "*is and never was* claiming any injury, lost wages and/or medical expenses on July 31, 2003, or any period beyond July 29, 2003, the date of [the] second and final epidural treatment." (Emphasis added).  While Carawan's assertion is accurate with regard to the trial itself, it is inaccurate as to the litigation at large.  The record calls into question whether her second epidural or the Six Flags video led to her remarkable recovery.

¶32.    Until the day before trial, Carawan had sought damages through at least November 3, 2003.  In her motion in limine filed April 5, 2004, Carawan stated that "she is not claiming any injury as a result of this wreck *beyond November 3, 2003*." (Emphasis added).  Medical records, which post-date July 29, 2003, and were not admitted at trial, confirm that Carawan claimed to continue having problems into August 2003.[22]  Carawan did not disclose her intent to forgo any claim for damages past July 29, 2003, until a hearing conducted one day before trial.  It is clear that Carawan made a calculated decision not to seek damages past July 29, 2003, in an effort to exclude the Six Flags video.  While Carawan was certainly free to make such stipulation, it does not follow that all evidence subsequent to this date automatically becomes irrelevant.

---

[22] In an office note dated August 12, 2003, Bazzone stated that "the patient's symptomatolgy [sic] has not really changed since I last saw her."  Accordingly, Bazzone restricted her to work three days per week, eight hours a day, for approximately three months.

15

¶33. For all the aforementioned reasons, we find that the Six Flags video was relevant evidence.

¶34. Our second inquiry is whether the trial court abused its discretion in excluding the video on the basis that its prejudicial value outweighed its probative value. *Fitch v. Valentine*, 959 So. 2d 1012, 1022 (Miss. 2007). Rule 403 provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,[23] confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Miss. R. Evid. 403.

¶35. Carawan basically argues that the prejudicial nature of the Six Flags video stems from its lack of relevance in that no damages were being sought on or after that date.[24] We already have determined that the video was relevant. Aside from its damaging effect to Carawan's

---

[23] "'Unfair prejudice,' according the [sic] Advisory Committee Note to Fed. R. Evid. 403, 'means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Abrams v. Marlin Firearms Co.*, 838 So. 2d 975, 981 (Miss. 2003). Although not binding, this Court considers federal interpretations of the Federal Rules of Evidence as persuasive where the wording of such rules is similar or identical to the Mississippi Rules of Evidence. *See McGee v. State*, 569 So. 2d 1191, 1196 (Miss. 1990), overruled in part on other grounds.

[24] Carawan also cites a case from the Court of Appeals of Louisiana concerning the dangers of misleading a jury by admitting a video whose editing can leave the jury with a false or prejudicial impression. *Quinn v. Wal-Mart Stores, Inc.*, 774 So. 2d 1093, 1098 (La. App. 2 Cir. 2000) (quoting *Orgeron v. Tri-State Road Boring, Inc.*, 434 So. 2d 65 (La. 1983)). However, she does not communicate whether or how the Six Flags video did this. After reviewing the tape, we are unable to conclude that it could have left the jury with a false or prejudicial impression.

16

case, we are unable to determine how its admission would unfairly prejudice Carawan. A reasonable juror could understand that the video calls into question the severity of Carawan's injuries prior to July 29, 2003, and therefore challenges the necessity of at least some of her medical expenses, the validity of her lost wages, the extent of her pain and suffering, and the legitimacy of her entire claim.

¶36. We find that the probative value of the Six Flags video was not substantially outweighed by the danger of unfair prejudice to Carawan. Therefore, we find that the trial court abused its discretion by excluding such evidence.

## CONCLUSION

¶37. Carawan acted within her rights by not seeking damages for the time after July 29, 2003. However, that decision did not mean that relevant, probative evidence past that date should have been excluded from the jury's consideration. Because we find that the trial court erred in excluding the July 2003 Six Flags video, and because this error affected James's substantial right to present his defense, we reverse the trial court's judgment and remand this case for a new trial consistent with this opinion.

¶38. **REVERSED AND REMANDED.**

**SMITH, C.J., CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND LAMAR, JJ. GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, P.J. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

**RANDOLPH, JUSTICE, SPECIALLY CONCURRING:**

17

¶39.    I concur with the majority that the trial court abused its discretion in excluding the Six Flags video.  I write separately to address a related abuse of discretion by the trial court.

¶40.    According to the majority:

> [w]ith this new evidence, on September 11, 2003, James filed a *motion to compel a supplemental deposition* of Carawan regarding her physical limitations prior to July 31.  At a hearing on September 15, 2003, the trial court *denied* James's Motion to Compel and ordered immediate disclosure of the July 2003 video.

(Majority Opinion at ¶14) (emphasis added).  This Court previously has stated that a party "is justified in refraining from informing [the other party] of its recordings while the surveillance was in progress, *but it must still comply with discovery in some meaningful way*." ***Williams v. Dixie Elec. Power Ass'n***, 514 So. 2d 332, 336 (Miss. 1987) (emphasis added).  Toward the end of compliance with discovery, this Court added:

> [t]he values of surprise could be largely preserved by *providing discovery or pretrial revelation of impeachment material* which falls within the present category only at a time shortly before trial, and *only after the party asked about the existence and nature of such material had been given an opportunity – ordinarily by deposition – to commit the inquiring party to a final version of the events and claims related to the impeachment material*.  This procedure should forestall most conforming testimony, and would afford a reasonably effective means of embarrassing those who might still attempt to meet the impeaching material in untruthful ways.  At the same time, it would be possible to prepare to meet impeaching material which is susceptible of honest explanation or refutation.

*Id*. (quoting Cooper, *Work Product of the Rulemakers*, 53 Min. L. Rev. 1269, 1318 (1969), quoted in C. Wright & A. Miller, *Federal Practice and Procedure*, § 2015 (1970)) (emphasis added).  Had the trial court granted James's motion to compel a supplemental deposition of Carawan, i.e., permitted the mandated procedure, it would have appropriately forestalled an

18

attempt by Carawan "to meet the impeaching material in untruthful ways[,]" ***Dixie Elec.***, 514 So. 2d at 336, or, as in this case, to repress the evidence by conforming the pleadings, thus requiring neither honest explanation or refutation.

**SMITH, C.J., WALLER, P.J., CARLSON, DICKINSON AND LAMAR, JJ., JOIN THIS OPINION.**

**GRAVES, JUSTICE, DISSENTING:**

¶41. The trial court did not abuse its discretion in granting Ms. Carawan's motion in limine to exclude video surveillance evidence from July 31, 2003. Accordingly, it is inappropriate to overturn the trial court's judgment.

¶42. The majority is remanding the instant case for a third trial. The first trial resulted in a mistrial as a result of the defendant violating the court's order by injecting evidence of the video surveillance tape into the trial. The second trial resulted in a verdict in the amount of $33,484.52, to which the trial judge correctly added the amount of $30,000. And now, without any justifiable reason whatsoever, this Court is setting aside the verdict of the jury, and is remanding this case to be tried yet again.

¶43. It is within a trial judge's discretion to make decisions regarding the admissibility of evidence. Miss. R. Evid. 104(a). When reviewing a trial court's admission or exclusion of evidence this Court applies an abuse-of-discretion standard. ***Payne v. Whitten***, 948 So. 2d 427 (Miss. 2007) (citation omitted). This Court may reverse if the error "adversely affects a substantial right of a party," or if the exercise of discretion appears arbitrary, capricious or unjust. ***Whitten v. Cox***, 799 So. 2d 1 (Miss. 2000).

19

¶44.   When determining whether or not a trial court abused its discretion in making a decision regarding the admissibility of evidence, "this Court will review the record to determine whether the trial court employed the proper legal standards . . . . The trial court's discretion must be exercised within the scope of the Mississippi Rules of Evidence and reversal will be appropriate only when an abuse of discretion resulting in prejudice occurs." *McMillan v. Rodriguez*, 823 So. 2d 1173, 1177 (Miss. 2002).

¶45.   A motion in limine is properly granted "when the trial court finds two factors are present: (1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury." *Nunnally v. R.J. Reynolds Tobacco Co.*, 869 So. 2d 373 (Miss. 2004) (internal citations omitted).

¶46.   Admissibility of evidence is governed by the Mississippi Rules of Evidence. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than without the evidence.  Miss. R. Evid. 401.  If evidence is relevant, then it may be admissible; if evidence is not relevant, then it is inadmissible.  Miss. R. Evid. 402.  Even if evidence is relevant, it may be inadmissible if the probative value of the evidence is substantially outweighed by its prejudicial value, among other things.  Miss. R. Evid. 403.

¶47.   Based on the legal precedent and Mississippi Rules of Evidence, Judge Simpson and Judge Vlahos did not abuse their discretion in granting Ms. Carawan's motion in limine. Before trial, Ms. Carawan limited her claim for damages to the period between the accident, which occurred on December 19, 2000, and July 29, 2003.  The video surveillance of Ms.

20

Carawan at Six Flags was taken on July 31, 2003, outside the time frame of her claim. The video surveillance is thus not relevant to Ms. Carawan's claim, since the recorded conduct took place after the period for which she sought damages for her injuries. As Judge Simpson noted at the hearing on April 5, 2005, the recorded conduct from July 31, 2003 does not bear on the existence or severity of Ms. Carawan's injuries between December 19, 2000 and July 29, 2003.[25] In other words, the video surveillance does not tend to make any fact of consequence more or less probable, and is, therefore, not relevant.

¶48. Even if the video surveillance were relevant, it would have unfairly prejudiced the jury against Carawan.[26] It would have given the impression that she had not in fact been seriously injured during the period for which she sought damages.[27] Since the evidence is not admissible and would be unfairly prejudicial, the two-prong standard in *Nunnally* is satisfied. *Nunnally*, 869 So. 2d 373. Furthermore, the trial court did not exceed the scope of the Mississippi Rules of Evidence. Judge Simpson and Judge Vlahos acted properly

[25] Judge Simpson properly stated on the record at the April 5, 2005 hearing that "[a]bsent any claim to be made, [the video surveillance] can only be viewed by [the jury] retrospectively to determine whether or not on a previous occasion she genuinely had an injury or to weigh the severity of the injury."

[26] Again, Judge Simpson properly noted on the record at the April 5, 2005 hearing that if the video surveillance were admitted and viewed by the jury, "no one could ever be compensated for injuries once they get well . . . . [E]very injury would be mitigated by virtue of getting well . . . . [T]he goal ought to always be in treatment to get well. You don't want to chill someone from getting well."

[27] It should be noted that the facts of the case indicate that Ms. Carawan received two steroid injections on July 15, 2003 and July 29, 2003, causing significant improvement to her condition, which supports the reasoning behind limiting her claim to the specified time frame.

21

within their discretion in granting the motion in limine.[28] Reversal is inappropriate given that there was no abuse of discretion resulting in prejudice.

¶49. The majority states that the video surveillance evidence is relevant in this case because it "casts doubt on the severity of Carawan's injuries prior to July 29, 2003." The majority concedes, however, that Ms. Carawan received steroid injections on July 15 and July 29, 2003 that, according to the testimony, made her feel "so much better" and "full of life." Still, the majority concludes that it is inconsistent for someone who had suffered injuries more than two-and-a-half years earlier to ride roller coasters after receiving medical treatment that greatly improved her condition.

¶50. In holding that the video surveillance evidence was relevant in this case, the majority relies solely on a Rhode Island case, ***Sweet v. Pace Membership Warehouse, Inc.***, 795 A.2d 524 (R.I. 2002). ***Sweet*** is distinguishable from this case. In ***Sweet***, the plaintiff suffered injuries after being hit by a forklift. ***Id.***, 795 A.2d at 526. Pace Membership conceded that it was liable for the accident. ***Id.*** Sweet limited his claim for damages to a specified time period, and the Rhode Island Supreme Court ruled that the trial court erroneously excluded video evidence taken after the time-limited claim. This appears on its face to be analogous to this case, but a closer reading of the facts indicates otherwise. Although Sweet limited his

---

[28] Judge Simpson, after consideration of Ms. Carawan's motion and oral argument of the parties, properly found that "given that no damages in the form of medical expenses, future lost wages, or future medical expenses are being sought from and after July 29 of 2003, I'm of the opinion that the prejudicial value of that outweighs its probative value given your plaintiff is seeking no relief after that date."

22

claim to a specific time period, throughout the trial, he claimed that he continued to suffer injury beyond the time frame of his claim, including up to and through the trial. *Id.* at 528. In contrast, Ms. Carawan does not claim injury beyond July 29, 2003 and did not represent at trial that she continued to suffer from the accident. In fact, Ms. Carawan testified that her condition had greatly improved as a result of the steroid injections she received in July 2003.

¶51. The majority's ruling sends a message that litigants should be prohibited from amending their claims (or at least limited in their ability to do so). This is antithetical to the practice of law. Parties litigating legal disputes frequently make strategic decisions regarding their claims and remedies in order to affect the admission or exclusion of evidence. Likewise, the likely admission or exclusion of evidence can also influence litigation strategies and the shaping of a case. The majority states that "Carawan did not disclose her intent [to] forgo any claim for damages past July 29, 2003, until a hearing conducted one day before trial. It seems clear that Carawan made a calculated decision not to seek damages past July 29, 2003, in an effort to exclude the Six Flags video." Ms. Carawan may very well have made such a calculated decision, but there has never been a limitation preventing a litigant from strategically abandoning certain claims, even on the eve of trial. In fact, the majority concedes that Ms. Carawan was free to do so. The majority departs from the law when it concludes that evidence relating to events beyond the time frame of Ms. Carawan's claim is relevant and admissible.

¶52. Judge Simpson's ruling is consistent with both the legal precedent and the Mississippi Rules of Evidence. Ms. Carawan did not claim injury, lost wages, or medical expenses

23

beyond July 29, 2003, and the video surveillance at issue was taken of Ms. Carawan after July 29, 2003, on July 31, 2003. Therefore, both Judge Simpson and Judge Vlahos exercised sound judicial discretion in granting Ms. Carawan's motion in limine regarding the video surveillance evidence from July 31, 2003.

¶53.    Therefore, the decision of the trial court should be affirmed.

**DIAZ, P.J., JOINS THIS OPINION.**